Philip L. Martin (8-7230)
API Law, PLLC
260 South 1200 West
Orem, UT 84058
philip@api.law
888-521-0322
*Attorney for Plaintiff*
*Kilgore Energy, LLC dba NeRD Power*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| **KILGORE ENERGY, LLC, a Utah limited liability company, dba NERD POWER,**<br>Plaintiff,<br>v.<br>**FRANK OMAN, an individual; JAMES REUBEN BURTON, an individual; UM CAPITAL, LLC, a Wyoming limited liability company; UM CAPITAL PCC, LLC, a North Carolina limited liability company; PHOENIX CAPTIVE SOLUTIONS, LLC, a North Carolina limited liability company; PCS CORE; CHRIS MARTIN, an individual; NY CRE IT NERD, LLC, a Wyoming limited liability company; PIVOT CAPITAL PARTNERS, LLC, a Florida limited liability company; PRIVATE FAMILY OFFICE & TRUST; CHARLES WASSELL, an individual; NICOLAS AARON, an individual; JOHN MICHAEL HEARNE, an individual; and JOHN DOES 1-10;**<br>Defendants. | **PLAINTIFF'S COMPLAINT**<br>Case No.____________________<br>Judge: ____________________ |

Plaintiff Kilgore Energy, LLC dba NeRD Power ("NeRD Power" or "Plaintiff"), by and through counsel, hereby asserts claims upon personal knowledge as to itself

and its own acts, and upon information and belief as to all other matters being based upon the investigation of counsel described herein allege against Defendants Frank Oman ("Oman"); James Reuben Burton ("Burton"); UM Capital, LLC ("UM Capital"); UM Capital PCC, LLC ("UM Capital PC"); Phoenix Captive Solutions, LLC ("Phoenix Captive"); PCS Core ("PCS"); Chris Martin ("Martin"); NY CRE IT NERD, LLC ("NY CRE"); Pivot Capital Partners LLC ("Pivot"); Private Family Office & Trust ("PFO Trust"); Charles Wassell ("Wassell"); Nicolas Aaron ("Aaron"); John Michael Hearne ("Hearne"); and John Does 1–10 (Omen, Burton, UM Capital, UM Capital PCC, Phoenix Captive and PCS collectively "UM Defendants" and NY CRE, Pivot, Aaron, Hearne, and Martin collectively "Issuer and Adviser Defendants"; and UM Defendants together with Issuer and Adviser Defendants collectively "Defendants") as follows:

## NATURE OF THE ACTION

1. This is an action to recover $2,000,000 that Defendants took from Plaintiff and never returned.

2. On November 19, 2025, Plaintiff subscribed for a 2% membership interest in NY CRE, a Wyoming special-purpose entity, for $2,000,000. NY CRE in turn lent that $2,000,000 to UM Capital under a Promissory Note and placed it with UM Capital under a Deposit Safekeeping Agreement. Another instrument, an Independent Surety Agreement, was to guarantee the principal. The Subscription Agreement states that the Subscription Agreement, the Surety Agreement and the Promissory Note are "all part of one transaction."

3. Plaintiff was told that the transaction was safe. The Executive Summary promised the entity would be professionally managed by an SEC-registered investment adviser and that "[t]he Entity's investment will be guaranteed by a bank which will guarantee a minimum return." The Deposit Safekeeping Agreement recited that UM Capital's lines of credit were "secured via a Surety that is reinsured through Lloyds of London" with "policy limits up to $1.5B per project," and, separately, that UM Capital's accounts "including but not limited to Truist Bank ("Safekeeping Account")" were "protected under a third-party Captive Insurance which mandates that the account be in a non-depletion status throughout the term of this agreement and under an A-rated or better ALL-RISK Surety." The Independent Surety Agreement promised $2,000,000 of coverage. Every one of those protections was false.

4. The surety never took effect. By its own terms it was effective "November 21st, 2025, but not before the Agreement Fee has been paid" and if the Agreement Fee "is not paid in full, as aforesaid, this Agreement shall be deemed null and void and of no force or effect." The surety was represented as being in effect. Hearne, Managing Director of Pivot, told Plaintiff the surety was in place. Then on November 26, 2025, one day after Plaintiff's $2,000,000 was wired, the purported surety confirmed cancellation for non-payment.

5. The surety would have been worthless even if funded. Section 16 of the surety excludes from coverage any demand involving a "dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time … by the

borrower or any proprietor, partner, director, trustee, officer, or employee of a borrower." The risk the surety was sold to cover was expressly excluded.

6. Further, the surety was not an institution. "ACHLIS" is 1412739 Ontario Inc., whose listed address – 111 Teal Drive, Blenheim, Ontario – is the same address given for the personal bank account, at a Canadian credit union, to which the $115,000 Agreement Fee was directed. The wire instructions name an "Owner Name: Peter Vercouteren," an individual.

7. The special purpose entity's capitalization was also fabricated. Schedule A to the Amended and Restated Limited Liability Company Agreement of NY CRE, dated the same day as the Executive Summary, represents that Private Family Office & Trust contributed $98,000,000 for a 98% interest, that Plaintiff contributed $2,000,000 for 2%, and that total capital contributions were $100,000,000. The Executive Summary states that NY CRE "will offer for sale $2 million in limited liability interests" and would close "upon receipt and acceptance of subscriptions for at least $2 million." Plaintiff paid $2,000,000 believing it was investing alongside a $98,000,000 anchor investor. Upon information and belief, no such contribution was ever made.

8. On information and belief, Private Family Office & Trust is an affiliate, assign, instrument or controlled entity of Pivot. A document shared by Pivot describes that it "manages the onboarding, compliance, and transaction oversight for PFO&T's project funding investment mandate."

9. The $2,000,000 was never held in safekeeping. No daily balance reports were ever provided, though § 4 of the Deposit Safekeeping Agreement required them. Burton admitted, in his own words, that Oman never deposited the full $2,000,000, but that Oman put in $1,500,000 and no more and that Burton allegedly covered the $500,000 shortfall by pulling money out of an entirely unrelated captive insurance program. That is not leverage, but comingling. Burton separately admitted, in writing, to fabricating Bank Secrecy Act disclosure paperwork by describing this transaction to a financial institution as a "joint venture" between energy companies.

10. Additionally, the protected-cell entity did not exist. The Deposit Safekeeping Agreement recites that UM Capital holds the deposit "via a third-party Captive Insurance Agreement," and Defendants described the structure to Plaintiff as running through a protected cell bearing UM Capital's name. UM Capital PCC was not organized in North Carolina until December 9, 2025, which was fourteen days after Plaintiff wired the funds. UM Capital PC's Articles of Organization were signed on December 8, 2025, by Burton on behalf of Phoenix Captive and Oman as Managing Member.

11. The captive fiduciary was barred from the securities industry. Upon information and belief, "Rueben Burton" is actually James Reuben Burton, Jr., who in March 2003 consented to an order of the U.S. Securities and Exchange Commission barring him from association with any broker, dealer, or investment adviser. That fact was never disclosed to Plaintiff.

12. The transactions are conflicted because the adviser sat on both sides. Pivot signed a Non-Discretionary Portfolio Management Agreement with Plaintiff on September 18, 2025, becoming Plaintiff's SEC-registered investment adviser. Pivot then became the Manager of NY CRE–the issuer selling securities to Plaintiff–and Hearne signed Plaintiff's Subscription Agreement on the issuer's side of the page. On November 20, 2025, five days before the wire, Pivot executed a second advisory agreement. Its preamble names NY CRE as "Client". Its signature page names "NeRD Power" as client, signed by its CEO, and Chris Martin, who was UM Capital's COO, as "Joint Owner". The signature block to Exhibit A of the same agreement names the Client as "Kilgore Energy, LLC" and the Joint Owner as "UM Capital, LLC." Section 18 of that agreement, addressed to "related Clients (i.e. married couple)," permits the Adviser to "rely upon instructions from either party with respect to disposition of the Assets."

13. The safekeeping term expired on January 25, 2026. No extension was ever executed. No money was ever returned.

14. What followed the wire was a campaign of concealment that has now run for ten months. Oman and burton told Plaintiff, over and over, across recorded telephone calls and text-messages threads, that a wire was "en route", "in process", "almost done", "scheduled", "going out today", "landing", and "for sure" arriving. It never arrived. Defendants supplied confirmation numbers for wires that were never sent. And in at least one instance it included a purported Fedwire reference number that Plaintiff's own bank confirmed did not correspond to any pending or completed

transaction. Defendants explained the delays with an escalating vocabulary of SWIFT, SBLC, MT760, MT175, and "ADM" terminology, routed through a Bank of America "hub," MUFG, an Isle of Man entity, a Canadian company called "Magnetic North," and a United Kingdom escrow account.

15. Plaintiff's money did not sit in safekeeping. Burton's own account indicates that Plaintiff's cash was pooled into a trust account holding reserves for "4 different captives," and Oman attempted to use the leveraged proceeds to buy real estate in South Carolina, which purchase was thwarted only when state insurance regulators flagged it as an improper captive investment.

16. On September 19, 2026, Burton sent an email to "rburon@leavelacrefarms.com" with Todd Fitch of NeRD Power in bcc. In this email Burton stated that there are "11 plus a few other" captives or claims fund due principal and interest. He further states that Phoenix Captive and PCS Core are separate companies, "they used to be one held the other" but they were split to "separate the medical/work comp risks from the financial risks, thereby reducing overall exposure." Burton reveals that the failure of one of his captives to comply with insurance law resulted in a loss of leverage and payment of "almost 3MM dollars to right size the credit facility" and that the state has categorized his captive pools as having "ongoing and irreparable compliance and capital failures." Burton claims that the DOI has recommended no funds from the Surplus or Reserve accounts be distributed, while also separately claiming that Truist is holding all disbursements on a ledger due to the comingling of "many of the accounts for Operations and

Surplus." The email indicates that these issues began more than 30 months ago, before the relevant transaction between NeRD Power, Phoenix Captive and UM Capital. That fact was never disclosed to Plaintiff.

17. Upon information and belief, Pivot, Plaintiff's SEC-registered investment adviser, ended its involvement with UM Capital under circumstances involving concerns materially similar to those alleged here, and said nothing to Plaintiff and made no attempt to recover funds for Plaintiff even when it controlled, as manager, the NY CRE special entity for NeRD Power.

18. The transaction was papered, and advertised, as a Regulation D, Rule 506(b) securities offering, with Plaintiff's $2,000,000 characterized as the sponsorship of the first $100,000,000 tranche of a far larger facility. Defendants sold that security through a web of material misstatements and omissions concerning the existence of the surety, the payment of the surety fee, the existence and capitalization of the issuing entity, the custody and segregation of the funds, and the principals' criminal and diversionary status.

19. The entity-side Defendants who were supposed to stand between Plaintiff and this loss did not. Aaron signed the Surety Agreement and the Deposit Safekeeping Agreement as Trustee "on behalf of" NY CRE, which was the special-purpose vehicle formed to hold the transaction "for the benefit of" Kilgore Energy. Aaron was appointed by UM Capital. He served the party across the table while signing for the party whose money was at risk. Hearne, acting through and on behalf of Pivot, exercised control over NY CRE and affirmatively represented to Plaintiff

that the surety was in place. This was a statement that was false when made and that Plaintiff relied on in releasing $2,000,000.

20. Plaintiff brings claims for breach of contract, fraud, fraudulent inducement, conversion, unjust enrichment, federal and Wyoming securities fraud, breach of fiduciary duty, aiding and abetting, civil conspiracy, negligent misrepresentation, fraudulent transfer, and civil RICO. Plaintiff seeks return of its $2,000,000, consequential damages, prejudgment interest, treble damages, punitive damages, attorneys' fees, the imposition of a receiver over UM Capital and related entities determined to hold the Plaintiff's funds, the imposition of a receiver over NY CRE, and the imposition of a constructive trust over the traceable proceeds of its deposit.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this action arises in part under the laws of the United States, specifically Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

22. This Court has jurisdiction over the federal securities claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and over the RICO claims pursuant to 18 U.S.C. § 1964(c).

23. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy.

24. This Court has personal jurisdiction over each Defendant.

25. The Subscription Agreement, Promissory Note and Deposit Safekeeping Agreement establish personal jurisdiction by contract for Defendants UM Capital, NY CRE, Private Family Office & Trust, Pivot, Hearne, Aaron and Martin, being bound by or having executed one or more of the aforementioned instruments.

26. As to the claims under the Exchange Act, Section 27 provides for nationwide service of process, 15 U.S.C. § 78aa(a), and the constitutional inquiry is therefore each Defendant's contacts with the United States as a whole. Each Defendant is a resident of, or maintains continuous and systematic contacts with, the United States.

27. As to the RICO claims, 18 U.S.C. § 1965(b) and (d) likewise authorize nationwide service of process where, as here, the ends of justice require that other parties residing in any other district be brought before the Court.

28. This Court has pendent personal jurisdiction over each Defendant as to the state-law claims because those claims arise from a common nucleus of operative fact with the federal claims over which nationwide service confers jurisdiction.

29. Independently, this Court has personal jurisdiction over each Defendant under Wyo. Stat. Ann. § 5-1-107 and the Due Process Clause. Defendants purposefully directed their conduct at Wyoming by transacting business with and

through NY CRE, a Wyoming limited liability company with its registered address at 1309 Coffeen Ave., Suite 1200, Sheridan, Wyoming 82801; by negotiating, drafting, and executing the Deposit Safekeeping Agreement, which is expressly governed by Wyoming law; by structuring the transaction through a Wyoming special-purpose entity in order to obtain the benefits of Wyoming law; and by directing communications, representations, and demands for and concerning funds to and through that Wyoming entity.

30. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), because acts and transactions constituting the violations alleged herein occurred in this District; under 18 U.S.C. § 1965(a); and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District and because the contract at the center of this dispute was made by a Wyoming entity and is governed by Wyoming law.

## PARTIES

31. Plaintiff Kilgore Energy, LLC dba NeRD Power is a Utah limited liability company with its principal place of business in Salt Lake County, Utah. Babe Kilgore is its Chief Executive Officer.

32. Plaintiff is the purchaser of the securities at issue. Plaintiff executed the Subscription Agreement of NY CRE on November 19, 2025, through Babe Kilgore, subscribing for an "Aggregate Subscription Amount" of "US$2,000,000" in exchange for "2% Percentage Interest of the Company."

33. Plaintiff is also the express beneficiary of the instruments it did not sign. The Promissory Note provides: "This PN acknowledges that the Lender (NY CRE IT NERD LLC) is for the benefit of Kilgore Energy, LLC DBA Nerd Power as beneficiary." The Independent Surety Agreement recites that it "is made by ACHLIS (the "Surety"), in favor of NY CRE IT NERD, LLC, for the benefit of Kilgore Energy, LLC DBA Nerd Power the "Obligee" and is signed on the oblige side by "NY CRE IT NERD LLC for the benefit of Kilgore Energy, LLC dba NERD POWER," naming Plaintiff as sole "Loss Payee" in the Exhibit A Cut Through Clause and as "BENEFICIARY" in Exhibit D.

***UM Defendants***

34. Defendant Frank Oman is a resident of Williamson County, Tennessee. Oman is the Managing Member of UM Capital PCC and of Phoenix Captive and was at all relevant times a controlling person of the UM Defendants. Oman's prior criminal matters were resolved through judicial diversion in Tennessee, as documented in a letter from Baddour Law LLP dated June 9, 2025, and, upon information and belief, Oman remained on active diversion status when he solicited Plaintiff's funds. That fact was never disclosed to Plaintiff.

35. Defendant James Rueben Burton is a resident of Union County, North Carolina. Burton is a Manager of Phoenix Captive and served as the captive fiduciary with respect to the funds at issue. Upon information and belief, Burton is the same person as James Rueben Burton, Jr., who on March 26, 2003, consented to the entry of an order of the Securities and Exchange Commission, Release Nos. 34-47574 and

IA-2118, barring him from association with any broker, dealer, or investment adviser. At all relevant times that bar remained in effect. Neither Burton, nor Oman, nor Pivot, nor Hearne disclosed it to Plaintiff.

36. Defendant UM Capital, LLC, is a Wyoming limited liability company with its principal place of business in Georgia. It is the Borrower under the Promissory Note and the Holder under the Deposit Safekeeping Agreement. On the signature page of the November 20, 2025, Pivot advisory agreement, the address printed beside Martin as "Joint Owner" is 1309 Coffeen Avenue, Sheridan, Wyoming, which is the same address as NY CRE and Private Family Office & Trust, rather than UM Capital's Atlanta address.

37. Defendant UM Capital PCC, LLC, is a North Carolina limited liability company, organized on December 9, 2025. The Articles of Organization list Phoenix Captive as organizer and registered agent and identifies Oman as "Managing Member."

38. Defendant Phoenix Captive Solutions, LLC, is a North Carolina limited liability company with its principal place of business in Union County, North Carolina.

39. On information and belief, PCS Core is an entity formed by or at the direction of Phoenix Captive and/or Burton and Oman. PCS Core was created to receive, hold, or shelter the assets and liabilities of Phoenix Captive. Every allegation made against Phoenix Captive is made equally against PCS Core, which is liable for Phoenix Captive's conduct and obligations as its successor, as a mere continuation,

as the surviving entity of a de facto merger, and as the transferee of assets transferred without reasonably equivalent value and with actual intent to hinder, delay, or defraud Phoenix Captive's creditors, including Plaintiff.

40. Defendant Chris Martin at all relevant times served as Chief Operating Officer and Executive Vice President of UM Capital. Martin signed the Term Sheet on September 11, 2025, the Promissory Note, and the Deposit Safekeeping Agreement, and is named as "Joint Owner" on the signature page of the November 20, 2025, Pivot advisory agreement, with the title "COO," opposite a client block naming Plaintiff.

41. Defendants UM Capital, LLC; UM Capital PCC LLC; Phoenix Captive Solutions LLC; PCS Core; Oman; Burton and Martin are referred to collectively as the "UM Defendants."

***Issuer and Adviser Defendants***

42. Defendant NY CRE IT NERD, LLC, is a Wyoming limited liability company with its principal place of business in Wyoming. NY CRE is the issuer of the Membership Interests sold to Plaintiff, the Lender under the Promissory Note, the Depositor under the Deposit Safekeeping Agreement, and the named Insured Party under the Independent Surety Agreement.

43. Defendant Pivot Capital Partners, LLC, is a Florida limited liability company with its principal place of business in Cook County, Illinois. Pivot is an investment adviser registered with the US SEC, CRD No. 335324. Pivot occupied three simultaneous roles in this transaction: Plaintiff's investment adviser under a

Non-Discretionary Portfolio Management Agreement dated September 18, 2025; it was the "Manager" of NY CRE under Section 1.1.27 and the signature page of the LLC Agreement; and it executed the acceptance of Plaintiff's Subscription Agreement on the issuer's side.

44. Defendant Private Family Office & Trust ("PFO Trust") is a Wyoming trust with an address of 1309 Coffeen Avenue, Suite 1200, Sheridan, Wyoming 82801. Schedule A to the NY CRE LLC Agreement identifies PFO Trust as a Member holding a 98% Percentage Interest on the strength of a stated Capital Contribution of $98,000,000.

45. Defendant Charles Wassell is an individual with unknown state residency. The Subscription Agreement designations Wassell as the person to whom notices to NY CRE are to be directed, at legal@pfotrust.com.

46. Defendant Nicholas Aaron is an individual, reachable at Trustee@PFOTrust.com. Aaron signed the Promissory Note for NY CRE over the printed name and title "Nicolas Aaron Trustee"; signed the Deposit Safekeeping Agreement for NY CRE over "Printed Name: Nicolas Aaron, Trustee"; signed the Independent Surety Agreement over the printed name "Nicolas Aaron" and the title "Trustee" in the block designated "NY CRE IT NERD LLC for the benefit of Kilgore Energy, LLC dba NERD POWER"; and signed the acceptance of Plaintiff's subscription as Trustee of PFO Trust.

47. Defendant John Michael Hearne is a resident of Alabama, CRD No. 5852531, and was a Managing Director of Pivot. Hearne signed Plaintiff's advisory

agreement for Pivot on September 19, 2025, signed the NY CRE LLC Agreement under the heading "MANAGER: Pivot Capital Partners LLC," over the printed name "John Michael Hearne" and the title "Managing Director"; and signed the acceptance of Plaintiff's Subscription Agreement under the heading "Pivot Capital LLC," over the printed name "John Michael Hearne" and the title "Manager." Hearne represented to Plaintiff before the wire that the Independent Surety Agreement was in place.

48. Defendants NY CRE, Pivot Capital, PFO Trust, Wassell, Aaron, and Hearne are referred to collectively as "Issuer and Adviser Defendants."

***Relevant Non-Parties***

49. On information and belief, ACHLIS is 1412739 Ontario Inc., whose director is Peter Vercouteren. Exhibit D to the Independent Surety Agreement gives the Surety's address as 111 Teal Drive, Blenheim, Ontario N0P 1A0, with contact Peter Vercouteren, ACHLIS1@Outlook.com. Exhibit B directs the $115,000 Agreement Fee to a Libro Credit Union account, beneficiary "Owner Name: Peter Vercouteren," address "111 Teal Dr, Blenheim, ON Canada N0P 1A0," which is the same address given for the surety entity.

50. Exhibit A to the Independent Surety Agreement, styled a "Cut Through Clause," refers to "policy/Binder(s) # ECO116319 issued by HUB INTERNATIONAL HKMB LIMITED, TORONTO, (the Insurers)," states that "[t]he liability under this Binder(s) are specifically reinsured by HUB under Managing General Agent agreement," and lists under "Related Policy(s)" both "HUB - ECO116319" and "CFC

Lloyds – PSM0139855745." Plaintiff is named as sole "Loss Payee." Upon information and belief, no such policy or binder was ever issued or in force for Plaintiff's benefit.

51. Emergent Energy PCC Ltd. and "Magnetic North," a Canadian entity, are entities Burton identified as sources or conduits for the funds he repeatedly promised to wire to Plaintiff. Emergent Energy LLP is an entity of which Burton is a manager.

52. Harrison Kordestani was identified by Burton as "internal counsel" and repeatedly cited as having confirmed wires with the bank; no such confirmation has ever been produced. "Creed" is an individual whom Burton described as someone "at the branch" whom Burton could call to affect wire outcomes; his identity and role remain unconfirmed. Susan is Burton's spouse, whom Burton repeatedly identified as holding a USB security token required to access the relevant banking systems.

53. Defendants John Does 1 through 10 are individuals or entities whose identities are presently unknown to Plaintiff who participated in, aided, or received the proceeds of the conduct alleged herein. Plaintiff will amend to name them when their identities are ascertained.

## <u>FACTUAL ALLEGATIONS</u>

### *A. Solicitation and the Term Sheet*

54. In late August and early September 2025, Defendants and their representatives solicited Plaintiff with a description of a structured financing program: a $2,000,000 deposit for every $100,000,000 of capital raised; funds to be placed in an escrow account with an "insurance wrap," moved "bank to bank"; claimed

access to "hundreds of billions"; an active $1.5 billion facility backed by a policy from Lloyd's; representations that the deals were registered with the SEC and that a CPA firm certified the Regulation D compliance; and that Pivot Capital would manage the money and the draw schedule.

55. On September 9, 2025, Babe Kilgore signed, as President of Kilgore Energy, LLC DBA NeRD Power, a Term Sheet captioned "$800 Million Capital Raise - $200 Million in 4 Tranches." Chris Martin countersigned for UM Capital as COO on September 11, 2025.

56. The Term Sheet identifies the parties as "UM Capital, L.L.C., a Wyoming company, and Kilgore Energy, LLC DBA NeRD Power a Utah company." The term sheet provides that "UM Capital, LLC shall have 60 days from the date of the origination fee payment to raise $200 million," as "tranche one of four totaling [sic] $800 million USD."

57. Section 3 provides that "UM Capital, LLC shall be entitled to a fully refundable upfront fee equal to 2.0% of the capital raised ($4,000,000 for tranche 1)."

58. Under the heading "Additional Provisions," the Term Sheet provides at subsection 6.1: "The capital will be raised through a Regulation D Rule 506(b) offering." Subsection 6.7 provides that "[a]ny disputes shall be resolved through arbitration in a mutually agreed jurisdiction." The Term Sheet is governed by Wyoming law.

59. The parties subsequently revised the structure, in the operative November 19, 2025, documents NeRD Power made a $2,000,000 contribution against a $100,000,000 tranche.

### *B. Pivot Becomes Plaintiff's Investment Adviser and Then the Issuer's Manager*

60. On September 18, 2025, Plaintiff and Pivot executed a Non-Discretionary Portfolio Management Agreement. Pivot is described in the first paragraph as "a registered investment adviser." Plaintiff is the "Client." Kilgore signed for Plaintiff; Hearne signed for Pivot.

61. Under Section 1(c), Pivot agreed to "monitor Client's account and . . . make recommendations to Client regarding the Assets." Under Section 3, "[t]he Assets shall be held by an independent custodian, not the Adviser." Under Section 5(d), Pivot's "authority is limited to placing trade orders in the Client's custodian account only upon Client's prior written, trade-specific consent," and Pivot "may not open accounts, change addresses, designate beneficiaries, or request withdrawals/transfers."

62. As a registered investment adviser under contract with Plaintiff, Pivot owed Plaintiff a fiduciary duty of loyalty, care, and full and fair disclosure of all material facts, including any conflict of interest.

63. Notwithstanding that duty, Pivot became the "Manager" of NY CRE, i.e. the entity that would issue and sell securities to its own advisory client. Section 1.1.27 of the NY CRE LLC Agreement defines "Manager" to mean "Pivot Capital Partners."

The Executive Summary states that the entity "will be formed as a Wyoming limited liability company and managed by Pivot Capital Partners LLC," and that the Manager "will evaluate potential investment opportunities offered by third parties" and "will be responsible for the management of the Entity."

64. On November 19, 2025, Hearne executed the acceptance of Plaintiff's own Subscription Agreement on behalf of the issuer, signing under the heading "Pivot Capital LLC" over the printed name "John Michael Hearne" and the title "Manager."

65. On November 20, 2025, just five days before the wire, Pivot executed a second Non-Discretionary Portfolio Management Agreement. Its preamble names "NY CRE IT NERD LLC" as Client. Its executed signature page, however, prints "Client Name (print): NeRD Power" and "Joint Owner Name (print): Chris Martin." The signature block to Exhibit A of the same agreement prints the Client as "Kilgore Energy, LLC" and the Joint Owner as "UM Capital, LLC." Hearne signed for Pivot, as "John Michael Hearne Jr.," on November 20, 2025.

66. Section 18 of the Non-Discretionary Portfolio Management Agreement, captioned "Client Conflicts," provides: "If this Agreement is between Adviser and related Clients (i.e. married couple), Adviser's services shall be based upon the joint goals communicated to Adviser. Adviser shall be permitted to rely upon instructions from either party with respect to disposition of the Assets, unless and until such reliance is revoked in writing to Adviser."

67. By executing that instrument with UM Capital's officer as "Joint Owner" alongside Plaintiff, Pivot placed Plaintiff and the borrower that owed

Plaintiff $2,000,000 into a single joint advisory relationship to which, on the face of Section 18, the "related Clients" provision permitting the Adviser to take disposition instructions from either party would apply.

68. Pivot issued an updated Conflict of Interest Disclosure in connection with the transaction. It states that "Pivot Capital Partners (the 'Asset Manager') is both an Asset Manager to the entity seeking project and/or acquisition financing (the 'Investee')., as well as the Asset Manager to the group in consideration of providing financing (the 'Funding Partner'). In addition, Pivot Capital Partners LLC will be the Manager of the Special Purpose Entity (the, 'Funding Vehicle') that will provide the funding to the project."

69. Paragraph 2 states: "Following the consummation of the transaction, John Michael Hearne ('Representative') will exercise management control over the Investor's investment vehicle to the transaction ('SPE')."

70. Paragraph 3 states that "[t]he Representative shall be paid a management fee, indirectly through the Manager, as described in the Limited Liability Company Agreement effective as of [Date TBD], for management services provided to the Company."

71. The disclosure closes: "Your receipt of any materials in connection with the Transaction and/or execution of Transaction-related documents and agreements with the Company in connection with the Transaction is an acknowledgement of your receipt and acknowledgement and understanding and agreement with this Disclosure."

72. The disclosure bears no date, no signature of Plaintiff, and no signature of Pivot. It does not identify the "Funding Partner" by name. It does not state the amount or rate of the management fee, instead referring to a limited liability company agreement "effective as of [Date TBD]."

73. It does not disclose that the Funding Partner would be the borrower of Plaintiff's money, that the same individual controlling the SPE would also be advising the borrower, that the captive fiduciary who would control the funds was barred by the Securities and Exchange Commission from association with any investment adviser, or any of the other matters set forth below.

74. The disclosure as made did not permit Plaintiff to give informed consent to the conflicts it gestured at and did not discharge Pivot's obligation as a registered investment adviser to make full and fair disclosure of all material facts to its client.

### *C. The Offering: The Executive Summary, the Subscription Agreement, and the Phantom $98M*

75. On November 19, 2025, NY CRE issued an Executive Summary describing itself as a "Special Purpose Entity" that "will seek to access a private investor allocation pool in an effort to invest in NeRD Energy Expansion Project."

76. Under "Entity Size," the Executive Summary states: "It is anticipated that the Entity will offer for sale $2 million in limited liability company interest ('Interests'), but the Entity will consummate an initial closing upon receipt and acceptance of subscriptions for at least $2 million in Interests. The minimum permissible investment will be $2,000,000, all of which will be due at closing."

77. Under "Legal Structure" it states that the entity, NY CRE "will be formed as a Wyoming limited liability company and managed by Pivot Capital Partners LLC," and that "Pivot Capital Partners LLC (CRD#: 335324), is an investment advisory firm registered with the SEC."

78. Under "Fees and Carried Interest," the Executive Summary states that "[t]he Manager of the Entity will receive an annual management fee equal to 0.5% highlighted in the newly formed entity's non-discretionary asset management agreement." The non-discretionary asset management agreement Pivot executed the following day sets a negotiated fee of 1.25%.

79. Under "Limited Returns and Distributions" in Exhibit B, it states, "The Entity's investment will be guaranteed by a bank which will guarantee a minimum return."

80. Exhibit B section "Newly Formed Entity" further states that the entity "intends to invest in an Investment Opportunity for which it is selected and which is approved by Pivot Capital Partners LLC (the 'Manager')," and describes the Investment Opportunity as one among "opportunities provided by certain U.S. banks."

81. The Executive Summary does not reference UM Capital, the Promissory Note, the Deposit Safekeeping Agreement, ACHLIS, Phoenix Captive, UM Capital PCC, Oman, or Burton. It does not disclose that the entity's entire capital would be wired to a private borrower under a two-month note, secured by a surety issued by a single-officer, Ontario corporation operating from a residential address.

82. On November 19, 2025, Plaintiff executed the Subscription Agreement. Appendix A states the "Membership Interests to Be Acquired" as "2% Percentage Interest of the Company" for an "Aggregate Purchase Price to be Paid" of "US$2,000,000."

83. The acceptance block of the Subscription Agreement reads "NY CRE IT NERD LLC" over the lines "By: Private Family Office & Trust (Registering Firm)" and "Its: Member," with the printed name "Nicolas Aaron" and title "Trustee"; a second block reads "Pivot Capital LLC" with the printed name "John Michael Hearne" and the title "Manager."

84. Section 7(b)(i) of the Subscription Agreement records that "[t]he undersigned has received a copy of the Executive Summary. The undersigned has not been furnished any offering literature other than the Executive Summary, and the undersigned has relied only on the information contained therein."

85. Section 23 provides that "[t]his Subscription Agreement, the Surety Agreement, and Promissory Note are all part of one transaction."

86. Also on November 19, 2025, NY CRE adopted an Amended and Restated Limited Liability Company Agreement naming Pivot as Manager. Schedule A, captioned "MEMBERS" states PFO Trust with Capital Contribution $98,000,000, Percentage Interest 98%; Kilgore Energy, LLC DBA Nerd Power Capital Contribution $2,000,000, Percentage Interest 2%; and a total $100,000,00 Capital Contribution for 100% Interests.

87. Schedule A is irreconcilable with the Executive Summary issued the same day. An entity that "will offer for sale $2 million in limited liability company interests" and will close "upon receipt and acceptance of subscriptions for at least $2 million" does not have $100,000,000 in member capital. Upon information and belief, PFO Trust never contributed $98,000,000 to NY CRE, and no such sum was ever received by, credited to, or available by the entity.

88. The pattern is confirmed by the earlier draft of the same documents. The version of the NY CRE Agreement dated October 13, 2025, recited the identical 98%/2% split at a stated $196,000,000 contribution by PFO Trust and a $4,000,000 contribution by Plaintiff, matched to a then-contemplated $200,000,000 tranche and a $4,000,000 allocation fee. When Plaintiff's contribution was halved to $2,000,000, PFO Trust's stated contribution was halved to $98,000,000. The stated capitalization was not a fact; it was a figure derived from whatever Plaintiff agreed to pay.

89. The represented capitalization was material. It told Plaintiff that a substantial anchor investor had committed ninety-eight dollars for every two of Plaintiff's, that Plaintiff's capital was a minority participation in a funded $100,000,000 vehicle, and that the entity had the resources described in the offering. None of that was true.

***D. The Three Instruments***

**i. The Promissory Note (Exhibit 1)**

90. The Note is "made and effective on November 19, 2025," between UM Capital, LLC as Borrower and NY CRE as Lender. Under the terms of the Note,

Borrower promised to pay "to the order of Lender in installments as follows: $2,000,000 (TWO MILLION) on or before January 19th, 2026." Paragraph 4 provides "If suit be commenced on the said note, the parties hereto jointly and severally agree to pay to the Lender of said note a reasonable attorney fee." Paragraph 9 declares that the Lender is "for the benefit of Kilgore Energy, LLC DBA Nerd Power as beneficiary." Accordingly, the Attorney fee entitlement runs for Plaintiff's benefit. Paragraph 5 provides that "The borrower agrees that the Surety be enforced immediately in the event of default." The Note was signed for the Borrower by Chris Martin as COO/EVP and for the Lender and Aaron as Trustee.

91. Paragraph 2 provides that on default in payment "the Lender of this note may, without notice or demand, declare the entire principal sum then unpaid immediately due and payable." The Note specifies no rate of interest.

**ii. The Independent Surety Agreement (Exhibit 2)**

92. Independent Surety Agreement No. NERD112125, "in addition to Binder No. ECO116319," dated November 21, 2025, was issued by ACHLIS in favor of NY CRE "for the benefit of Kilgore Energy, LLC DBA Nerd Power." Coverage was capped at $2,000,000 with a $115,000 Agreement Fee. Aaron signed for the obligee.

93. The Term provision states: "Effective Date: November 21st, 2025, but not before the Agreement Fee has been paid."

94. Section 4 provides: "The Agreement Fee (the 'Agreement Fee') must be paid in full concurrently with the execution and delivery of this Agreement, in the

sum of $115,000 US Dollars. If the Agreement Fee is not paid in full, as aforesaid, this Agreement shall be deemed null and void and of no force or effect."

95. Section 16 provides that the Agreement "excludes the portion of any Demand for Payment which involves or was contributed to by any … dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time… by the borrower or any proprietor, partner, director, trustee, officer, or employee of the borrower."

96. The Independent Surety Agreement is internally incoherent in ways that would have defeated any claim under it. Section 1 defines the "Obligation" as "the monetary owing to the Obligee by the Insured Party", with the Insured Party defined on the first page as NY CRE, not as UM Capital, and Kilgore Energy, LLC DBA Nerd Power as the Obligee.

97. The instrument by its terms guarantees the wrong party's debt. Section 1 states that copies of the Promissory Note "are attached hereto as Exhibit C," but Exhibit C is the Subscription Agreement; the Note is described at Exhibit E. Section 1 dates the Note November 21, 2025, while Exhibit E identifies it as the "NY CRE IT NERD LLC Promissory Note 11.7.2025," and the executed Note is dated November 19, 2025.

98. Also, Section 5 makes the Agreement "null and void and of no force or effect if the Loan Agreement is amended or modified without prior approval in writing by the Surety," and requires the Obligee to represent that the document at "Exhibit E is a true, correct and complete copy of the Loan Agreement."

99. The errors and inconsistencies contained in the Promissory Note would have rendered the surety unenforceable and are evidence of the carelessness or fraudulent nature of the surety.

100. Exhibit B directs the $115,000 Agreement Fee to an account at Libro Credit Union in the name of "Peter Vercouteren," an individual, at 111 Teal Dr, Blenheim, ON. This same address is given in Exhibit D for the Surety itself.

**iii. The Deposit Safekeeping Agreement (Exhibit 3)**

101. The Deposit Safekeeping Agreement is dated November 24, 2025, between NY CRE as Depositor and "UM Capital, LLC via a third-party Captive Insurance agreement and a SURETY agreement" as Holder. Aaron signed for the Depositor; Martin signed for the Holder.

102. The opening recitals state that "UM Capital, LLC ('UMC') is a private project investment fund that maintains multiple lines of credit for project financing. These lines are secured via a Surety that is reinsured through Lloyds of London and has policy limits up to $1.5B per project. This Surety is an all-risk policy that enables self-insurance in project financing." It continues: "UMC holds multiple accounts both directly and indirectly, in tier-one banks in the USA, Canada, and the UK, including but not limited to Truist Bank ('Safekeeping Account') and protected under a third-party Captive Insurance which mandates that the account be in a non-depletion status throughout the term of this agreement and under an A-rated or better ALL-RISK Surety ('SURETY')."

103. Section 1 provides for a deposit of "$2,000,000 (two million dollars) … with the Holder for two months, commencing on November 25, 2025, and ending on January 25, 2025." The stated January 25, 2025, is a scrivener's error for January 25, 2026. Under Section 3, the Holder agreed "to return the full Deposit amount to the Depositor unless otherwise agreed in writing" "[u]pon the expiration of the two months". No writing extending the term was ever executed.

104. Section 4 provides: "Funds will be placed on deposit within Truist, protected under Captive Insurance Policy No. FC-2025-00A12. Holder agrees to issue daily balance reports through the term of this agreement." No daily balance report was ever issued.

105. Section 2 states the purpose of the deposit as "to provide safekeeping for the Depositor for the project financing underwriting phase with UM Capital, LLC" and adds: "The Depositor acknowledges that Holder has the right to allocate funds to UM Capital's Capital Table for monetization of project financing during the term." That allocation right is expressly bound by the same instrument's recitals. It permitted allocation to UM Capital's own capital table, for the monetization of project financing, during the Term, while the account remained "in a non-depletion status" at Truist under an A-rated all-risk surety. It did not authorize transferring Plaintiff's money to captive insurance programs belonging to unrelated participants, applying it toward a private real estate purchase in South Carolina, or leaving it unaccounted for after the Term expired.

### *E. The Wire, the Surety's Collapse, and Default*

106. On November 24, 2025, Hearne wrote to Kilgore, copying UM Capital at mfg@umcap.co, Jameson Pugh of Pivot, and David Gunther of UM Capital: "Per Babe, with documentation covering Clause 16 (regarding fraud and acts of dishonesty exclusions) and the executed Surety, good to wire after. Frank/David, can you have that drafted?" Hearne then quoted Section 16 of the Independent Surety Agreement in full, and closed: "Babe, please confirm path." Kilgore replied: "Thanks John. Along with having the executed Surety, and that we can draw up that document, we are good."

107. By that exchange, Plaintiff's own investment adviser identified two conditions to be satisfied before the $2,000,000 would move: documentation curing the Section 16 exclusion, and delivery of the executed Surety Agreement. No documentation curing the Section 16 exclusion was ever drafted or delivered.

108. The next morning, Hearne emailed Kilgore: "Good morning? The executed surety and the safekeeping doc are to you now. I have also arranged for the $500k to be wired to the SPE as well. Please advise when comfortable and can move forward ASAP." Kilgore replied "Hi John, I think you may have the sent me the wrong version of the Surety. The one you sent me was not signed by the Surety (Peter)."

109. Hearne represented the Surety had been executed, causing NeRD Power to rely on the assumption that a valid and enforceable Surety was in place. The $2,000,000 was wired after receipt of that information.

110. On or about November 21, 2025, the $115,000 Agreement Fee was the subject of a purported payment pursuant to the Independent Surety Agreement Exhibit B.

111. Among the materials furnished in connection with the transaction was a document captioned "Momentum Financial Group LLC – Specific Account Statement," generated October 29, 2025, showing Chris Martin as Account Owner, UM Capital LLC as the Company Name, an account number of 5000956511849, account type "MFG PREFERRED EQUITY HOLDING ACCOUNT," with "Active" status and a single entry dated September 5, 2025, ID 3094, Description "UM Capital LLC $100M Chris Martin" in the amount of $100,000,000 producing a "Current Balance" of $100,000,000.

112. Upon information and belief, that statement does not reflect any actual deposit of $100,000,000 as Momentum Financial Group LLC is not a regulated depository institution.

113. On November 25, 2025, $2,000,000 was wired for Plaintiff's account in reliance on the representations described above.

114. On November 26, 2025, Vercouteren emailed notice cancelling the Surety for non-payment of the Agreement Fee.

115. On a call between Oman and Kilgore on December 5, 2025, Oman told Kilgore that the cancellation occurred because he had issues getting the wire out, then said they had the wrong account number, were waiting for the funds to settle

and that the wire would be resent so the Surety could be reissued. The Surety was never reissued. On information and belief, no wire was ever attempted.

116. Also on December 5, 2025, Hearne told Kilgore that Oman had represented to Hearne that the Surety was paid for. On information and belief, Hearne and Pivot accepted the representation from Oman and UM Capital without ensuring payment of the Surety Agreement Fee when they made the representation to Kilgore and NeRD Power.

117. Then on December 8, 2025, Burton executed the Articles of Organization of UM Capital PCC as Manager of Phoenix Captive, the organizer. The Articles were filed with the North Carolina Secretary of State on December 9, 2025.

118. The captive structure that Defendants represented would hold and protect Plaintiff's deposit was to be housed in UM Capital PCC, which did not exist when the transaction was negotiated, executed or funded. To the extent Oman or Burton undertook obligations on behalf of that unformed entity, they acted as its promoters and are personally liable for those obligations.

119. The Promissory Note matured on January 19, 2026. UM Capital did not pay. The Deposit Safekeeping Agreement term expired on January 25, 2026. UM Capital did not return the deposit. No portion of the $2,000,000 has ever been repaid.

120. On January 19, 2026 (the day the Promissory Note matured), Kilgore wrote to UM Capital at mfg@umcap.co and to David Gunther, stating that Plaintiff was "supposed to be 7-8 days from funding," requesting execution of loan documents, and explaining that Plaintiff "ha[d] made a number of commitments based on this

timing, including expensive bridge capital and other highly critical items." On January 26, 2026, only one day after the Deposit Safekeeping Agreement term expired, UM Capital replied in writing: "Yes, big week. Swiss team is pushing, we are pushing. Waiting on bank processing now. Will provide full update at end of day." No funds were returned.

121. On March 10, 2026, Strong & Hanni, P.C., through Graden P. Jackson, Esq., served a Notice of Default and Demand for Repayment on Oman, citing the default on the Note, the surety misrepresentation, and the Pivot Capital and Regulation D 506(b) representations, and advising that the matter would be referred to the SEC, FINRA, the North Carolina Department of Insurance, the FBI, the securities regulators of Wyoming, Georgia, Arizona and North Carolina, the state Attorneys General, and the Internal Revenue Service if unresolved. Defendants did not cure.

122. On April 17, 2026, Plaintiff caused a "Formal Notice of Material Discrepancy" to be distributed to all known intermediaries, insurance participants, financial institutions, surety representatives, and counterparties. It identified Oman, Martin, Aaron and David Gunther as non-responsive.

123. On or about April 22, 2026, a call was convened that Plaintiff understood would include a representative of Truist Bank. But no Truist representative participated; however, Burton did. On that call the reserve account holding Plaintiff's funds was described as held at Truist in the name of PCS Core, and the funds were supposed to be leveraged at and rations of 1.14 and 1.81 were referenced.

### *F. The Ten-Month Campaign of False Wire Promises*

124. Beginning no later than February 2026 and continuing through the filing of this Complaint, Oman and Burton engaged in a sustained pattern of representing to Plaintiff that funds had been sent, were being sent, or were imminent. On each occasion the representation was false. On no occasion did any money arrive.

125. On February 24, 2026, on a recorded call, Oman stated that the Surety had not been funded because "my commitment was we would post a surety once the funds were at risk. The funds are not at risk until they leave to go pay for the MT760." This statement contradicts the prior assurance that the surety was already in place before the wire. When Kilgore raised the shifting representations, raising the contractual obligations to fund the Surety and representations of its placement prior to wiring the $2,000,000, Oman replied with again a different story.

126. Oman falsely represented that money was sent to Peter, but "was going through some intermediary bank over to a credit union and they didn't take it. So by the time it bounced back and forth, it landed at Truist" and Oman decided that since it was "no longer at risk" they could postpone funding the Surety until it the money was at risk. Oman separately claims on the same call to have "just posted 22.7B to our books in the last two weeks."

127. On March 5, 2026, on a recorded call, Oman described a funding chain involving MT175 and MT760 instruments, standby letters of credit, a Bank of America "hub," MUFG, a $100,000,000 "ADM," "2-to-1 leverage," and a "family office,"

and stated: "the two is en route back to you guys … I'm expecting it to go out today." Despite these representations, no funds were sent.

128. On March 6, 2026, on a recorded call, Oman explained that funds could not move because of a USB-token and retina-scan access requirement on a new "treasury management platform." Variants of this excuse recurred for months.

129. On March 13, 2026, Plaintiff learned that Joel Turner, through Dynamic City Capital, had wired funds to UM Capital, had not been repaid, had filed suit asserting a claim of approximately $400,000 plus expenses, had been forced to serve Oman by email, and anticipated a default judgement.

130. On April 22, 2026, on a recorded joint call, Oman stated that the funds were routed through Truist Insurance Holdings and an Isle of Man entity, that the captive's maturity was October 2026, and that Plaintiff's money "never has left Truist."

131. On June 29, 2026, Burton sent Plaintiff a screenshot of a purported wire notification, Confirmation No. OW00007098744200, stating that $2,000,000 had been returned "at the request of the recipient." Kilgore disputed this in real time, responding that he "obviously did not request it to be cancelled." Burton's explanation was evasive and included a reference to calling "Creed … at the branch."

132. Between July 24 and July 30, 2026, Burton repeatedly stated that a wire was coming from escrow, was "almost done," or would go out "tomorrow." Each date passed with no funds received.

133. On July 28, 2026, Burton forwarded a screenshot of a cryptocurrency wallet showing a Tether balance of $3,207,166.12, offered as informal proof of funds. The image was accompanied by promises for return of funds. No actual transfer was made to Plaintiff.

134. On July 31, 2026, Burton stated that “15 wires” had gone out that day. No funds were received.

135. On August 1, 2026, Burton stated “He was debited at 1248 wst. It was under the cutoff.” No wire was ever confirmed nor received.

136. On August 3, 2026, Burton provided Plaintiff with a specific Fedwire reference number: 202607311B7033R016331. Kilgore telephoned Zions Bank directly. Zions confirmed that it had no record of any transaction under that reference and that a wire sent that morning would already have posted. Confronted, Burton responded: “Well, shit… it was debited on Friday.”

137. Also on August 3, 2026, Burton admitted in writing that he had fabricated Bank Secrecy Act disclosure paperwork by describing the transaction to a financial institution as a “joint venture” between energy companies.

138. On August 7, 2026, Plaintiff wrote: “our $2 million is not returned to us and it has royally f[***]ed us… without money, and without proof that this is even in the works, I cannot hold this any longer.” Burton responded with the allegation that Oman has roughly $4,000,000 in outstanding obligations and had “borrowed money from others and never performed.”

139. On August 17, 2026, Kilgore telephoned Zions Bank again, and Zions confirmed there was "no wire pending …. nothing pending," nothing initiated, and no amount showing.

140. On August 24 and 25, 2026, Burton promised that a $1,500,000 wire would land "for sure" that day. It did not. Burton's response when pressed was that "it's not banking it's insurance… it has its own process."

141. On September 4, 2026, Burton stated that cash "has moved from Emergent Energy PCC Ltd acct at Truist/Stone Point and is crediting today," and confirmed "yes landing" when pressed. No funds were received.

142. On September 1, 2026, Burton emailed Plaintiff a purported "DEBIT CONFIRMATION" under the caption "Treasury Solutions Client Support," showing Transaction Reference Number 2026090100016656, a debit party of "PHOENIX CAPTIVE SOLUTIONS LLC, 105 GRAHAM HALL CT, MATTHEWS, NC," account number 1340028309731, and an amount of $1,500,422.00. The document is facially incoherent: it bears a "Value Date" of August 17, 2026, and a "Transaction Posting Time" of September 11, 2026 — a posting date ten days after the document was transmitted. No funds were received, then or afterward.

143. On September 10, 2026, Burton wrote that "[y]our wire was taken from EE Resources PCC LTD captive account 2 weeks ago on a thursday," that "[t]he bank has held all final credits until the claims have been solved," and that "the DOI [is] suing us on the bond of 4.5MM which is also a claim." Todd Fitch replied, in writing, that Plaintiff had gone "from (fake) reference numbers stating a wire is imminent in

hitting our account, to now you need to process claims and not sure what to expect," and that "I have yet to see anything that substantiates anything you say." Once again, no funds were received.

144. As of the filing of this Complaint, no portion of the $2,000,000 has ever been received by Plaintiff or by NY CRE.

145. Each of the representations catalogued above was made by wire, by interstate telephone call, text message, or electronic mail, and each was a separate use of the wires in furtherance of a scheme to defraud within the meaning of 18 U.S.C. § 1343.

***G. Burton's Recorded Admissions***

146. On June 10, 2026, on a recorded call Burton admitted the following:

a. Oman never deposited the full $2,000,000. Burton states Oman "told me he got two million in, but he was only going to send 1.5." Oman deposited $1,500,000 and no more.

b. Burton covered the $500,000 shortfall, plus additional fees, by taking funds from an unrelated captive insurance program – "SafeCare" – in order to make what Burton described as the leverage math work. Burton explicitly labels his activity as "co-mingle[d]" funds.

c. Oman attempted to use the leveraged proceeds to purchase real estate in Bluffton, South Carolina for approximately $3,400,000 through one Nicholson Law Firm, and that the purchase was blocked when state insurance regulators flagged it as an improper captive investment.

147. Burton's June 10, 2026, admission directly contradicts Oman's repeated representations to Plaintiff, in writing and on recorded calls, that the full $2,000,000 had been deposited.

148. Burton has separately claimed that "there is no proximity to you and Phoenix, except that I know it was all borrowed capital. I have no exposure here."

149. Burton has separately described Plaintiff's cash as sitting in "a trust account for reserves for 4 different captives, all but one are 2x your size." Upon information and belief, Phoenix Captive's reserve accounts total approximately $17,000,000 across multiple parties.

150. In an email sent from Burton with Todd in blind carbon copy, subject: "Phoenix Captive Solutions and PCS CORE LTD" Burton made statements that reveal pertinent details:

a. There are "11 plus a few others … receiving this email" because they "have a captive, [Phoenix Captive] started one for you, or you have capital invested in a claims fund and are due principal and interest."

b. "Phoenix Captive Solutions and PCS Core are 2 separate companies; they used to be one held the other. I split them up to separate the medical/work comp risks from the financial risks, thereby reducing overall exposure. This is as it turns out was a mistake. This is a mistake I am now having to fix."

c. "All of this laid up risk and loss of leverage began over 30 months ago … long story short we lost our captive manager and had to manage them

ourselves under a one year probation scenario or risk having them being taken over by the state."

d. While PCS CORE and Phoenix Captive Solutions are being repooled or merged back together, "the DOI had recommended that no funds from the Surplus, or Reserve accounts be distributed."

e. "Lastly, there were many times we tried to set up wires and send cash this week was no exception, but the One View folks arent tied into the TIH/StonePoint mess. Since many of the accounts for Operations and Surplus are comingled, Truist is holding all the disbursements on a ledger and not noticing us in real time. We have been left with all of the risk of dealing with our customers and none of the resulting performance which has been held now by DOI directives and TIH compliance."

151. Burton, PCS Core and Phoenix Captive knew of the captive problems when he solicited funds from Plaintiff.

152. Further, Burton, PCS Core and Phoenix Captive have commingled funds and used Plaintiff's funds to repay other clients in a Ponzi-type scheme.

153. Plaintiff's $2,000,000 was not held in safekeeping at Truist in a non-depletion status under an A-rated all-risk surety, as the Deposit Safekeeping Agreement recited. Upon information and belief, it was pooled with reserves belonging to at least four separate captive insurance programs and applied to purposes unrelated to Plaintiff.

154. Burton's admission that he drew on the SafeCare medical malpractice captive to cover Oman's $500,000 shortfall establishes that Defendants were moving client funds between unrelated captive programs to paper over shortfalls in this transaction.

155. On June 16, 2026, Plaintiff received a wire document showing a $3,600,000 debit party originating from Phoenix Captive Solutions LLC. That figure corresponds to no transaction involving Plaintiff.

156. Burton is subject to a substantial outstanding federal obligation that was never disclosed to Plaintiff. On August 10, 2026, Burton forwarded to Plaintiff correspondence from Julia Park, Assistant United States Attorney for the Western District of North Carolina, stating that "Mr. Burton currently owes $2,715,625.23," that he "made his last payment in early 2026," and that a federal lien encumbers property in which he holds an interest, such that "half of the net proceeds (50%) must be sent to the Clerk of Court at the federal courthouse." In the same message Burton stated that he had "already cross collateralized the captive with EE cash." On August 5, 2026, Burton had written that he "had to pay the US Atty for the Financial [Lit]igation unit, 150k today."

157. Following receipt of the March 10, 2026, demand letter and the April 17, 2026, notice, upon information and belief, Oman and Burton caused Phoenix Captive to transfer assets and liabilities to PCS Core and caused the Truist reserve account holding Plaintiff's funds to be titled in the name of PCS Core.

158. Upon information and belief, those transfers were made without receipt of reasonably equivalent value and with the actual intent to hinder, delay, or defraud Phoenix Captive's creditors, including Plaintiff.

159. Phoenix Captive was insolvent at the time of the transfers or became insolvent as a result of them.

160. Plaintiff has been damaged in the principal amount of $2,000,000, which was never returned.

161. Plaintiff has also suffered consequential damages. On August 19, 2026, documentation from Woodruff Electric Cooperative Corporation surfaced reflecting a commercial agreement with Plaintiff carrying a $2,000,000 payment deadline of September 1, 2026, that was directly dependent on the return of the missing funds.

162. Among other things, Plaintiff separately lost a bridge loan and a project as a consequence of Oman's failure to honor the funding commitment reflected in the Term Sheet.

163. Plaintiff has incurred and continues to incur attorneys' fees and costs, recoverable under Paragraph 4 of the Promissory Note as enforced for Plaintiff's benefit under Paragraph 9, under Wyo. Stat. Ann. § 17-4-509, and under 18 U.S.C. § 1964(c).

## CLAIMS FOR RELIEF

### COUNT I

### BREACH OF CONTRACT (PROMISSORY NOTE)

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

164. The Promissory Note dated November 19, 2025, is a valid and enforceable contract governed by Wyoming law. Offer and acceptance are memorialized via the signed and executed contract. Consideration was provided in the form of $2,000,000 and the promise by UM Capital to return the funds on or before January 19, 2026.

165. A true and correct copy of the Promissory Note is attached as Exhibit 1.

166. Plaintiff is the express intended beneficiary of the Note. Paragraph 9 provides: "This PN acknowledges that the Lender (NY CRE IT NERD LLC) is for the benefit of Kilgore Energy, LLC DBA Nerd Power as beneficiary." Plaintiff is entitled to enforce it.

167. All conditions precedent to Defendants' performance were satisfied, waived, or excused. The $2,000,000 was funded on November 25, 2025.

168. UM Capital breached the Note by failing to pay the principal on January 19, 2026, and at all times since, UM Capital further failed to honor Paragraph 5, by which "[t]he borrower agrees that the Surety be enforced immediately in the event of default." Having procured a surety that was void from inception for non-payment of the fee, UM Capital breached their obligation under the contract.

169. To the extent Oman or Burton undertook obligations on behalf of UM Capital PCC LLC before its organization on December 9, 2025, they are personally liable for those obligations as its promoters.

170. Phoenix Captive, PCS Core, Oman, Burton, and Martin are liable as alter egos of UM Capital. The UM Defendants disregarded corporate formalities, commingled funds across entities and unrelated captives, were inadequately capitalized for the obligations they assumed, shared addresses and officers, and used the corporate form to perpetrate the fraud alleged herein. The offices at 1309 Coffeen Avenue are shared between UM Capital, NY CRE, PFO Trust. In the event Phoenix Captive merged into PCS Core, or was succeeded by PCS Core, PCS Core is additionally liable as Phoenix Captive's successor.

171. Plaintiff has been damaged in an amount not less than $2,000,000, plus prejudgment interest at the Wyoming statutory rate, costs, and reasonable attorneys' fees under Paragraph 4 of the Note, which must be enforced for Plaintiff's benefit under Paragraph 9.

**COUNT II**

**BREACH OF CONTRACT**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

172. The Deposit Safekeeping Agreement dated November 24, 2025, is a valid and enforceable contract governed by Wyoming law. Plaintiff is its intended beneficiary. The Agreement was entered into by NY CRE, which the Promissory Note

expressly declares to be "for the benefit of Kilgore Energy, LLC DBA Nerd Power as beneficiary," for the sole purpose of placing Plaintiff's subscription proceeds with UM Capital; and it is the instrument by which the proceeds of the integrated transaction described in Section 23 of the Subscription Agreements were to be held and returned.

173. A true and correct copy of the Deposit Safekeeping Agreement is attached as Exhibit 3.

174. UM Capital breached the Agreement in at least five independent respects:

a. by failing to return the full $2,000,000 Deposit upon expiration of the Term on January 25, 2026, as Section 3 required, no written extension having been executed;

b. by failing to keep the funds "on deposit within Truist," as Section 4 required;

c. by failing to maintain the account "in a non-depletion status throughout the term of this agreement," as the Agreement recites;

d. by failing to "issue daily balance reports through the term of this agreement," as Section 4 required; and

e. by allocating and applying the Deposit outside the bounds of the limited allocation right in Section 2, including by transferring funds to captive insurance programs belonging to unrelated participants and by applying, or attempting to apply, leveraged proceeds toward a private real estate purchase.

175. UM Capital further breached the implied covenant of good faith and fair dealing with respect to the Contract by acting in a manner described above, which deprived Plaintiff of the benefit of the agreement.

176. UM Capital acted contrary to the parties' agreed purpose and justified expectations by using the funds for purposes not authorized by the contract.

177. Phoenix Captive, PCS Core, Oman, Burton, and Martin are liable as alter egos of UM Capital. The UM Defendants disregarded corporate formalities, commingled funds across entities and unrelated captives, were inadequately capitalized for the obligations they assumed, shared addresses and officers, and used the corporate form to perpetrate the fraud alleged herein. The offices at 1309 Coffeen Avenue are shared between UM Capital, NY CRE, PFO Trust. In the event Phoenix Captive merged into PCS Core, or was succeeded by PCS Core, PCS Core is additionally liable as Phoenix Captive's successor.

178. Plaintiff has been damaged in an amount not less than $2,000,000, plus interest, costs, and attorneys' fees.

**COUNT III**

**COMMON LAW FRAUD**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

179. Defendants made material false representations of existing fact to Plaintiff, including: that UM Capital's lines of credit were "secured via a Surety that is reinsured through Lloyds of London" with "policy limits up to $1.5B per project";

that the funds would be held at Truist "in a non-depletion status" under "an A-rated or better ALL-RISK Surety"; that the funds were protected under "Captive Insurance Policy No. FC-2025-00A12"; that the Independent Surety Agreement was in place and in force and the Agreement Fee had been paid; that the full $2,000,000 had been deposited into the captive structure; that Plaintiff's funds "never ha[d] left Truist"; that wires had been sent on the dates set forth in Section F above; and that Fedwire reference number 202607311B7033R016331 corresponded to a real transaction.

180. Defendants further concealed and failed to disclose material facts they had a duty to disclose by virtue of their superior knowledge, their custodial relationship to Plaintiff's funds, and their partial disclosures, which were misleading absent the omitted facts – including the facts set forth in Count [XII] below.

181. Defendants knew these representations were false when made, or made them recklessly. Burton's June 10, 2026, admission that Oman deposited only $1,500,000 establishes that Oman knew his contrary representations were false. Burton's written admission that he fabricated Bank Secrecy Act paperwork establishes his own knowledge and intent to deceive. The provision of a Fedwire reference number that Zions Bank confirmed did not exist establishes knowing falsity.

182. Defendants made the representations intending that Plaintiff rely, first to induce the transaction and wire, and thereafter to forestall litigation, attachment, regulatory referral, and collection while the funds were dissipated.

183. Plaintiff reasonably and justifiably relied, both in subscribing and wiring $2,000,000 and in forbearing from suit and other remedies for nearly a year thereafter.

184. Plaintiff has been damaged in an amount not less than $2,000,000, plus consequential damages, and is entitled to punitive damages.

## COUNT IV

## FRAUDULENT INDUCEMENT

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

185. Defendants induced Plaintiff to subscribe for the Membership Interests, to cause NY CRE to enter into the Promissory Note, the Independent Surety Agreement and the Deposit Safekeeping Agreement, and to wire $2,000,000, through the material misrepresentations and omissions described above.

186. Defendants made those representations with no intention of performing. The Agreement Fee was never paid to the surety; the surety was void from inception under its own Section 4. UM Capital PCC LLC did not exist. The full $2,000,000 was never deposited. No daily balance report was ever issued. No funds were segregated.

187. Plaintiff reasonably believed the representations to be true, but they were not.

188. Had Plaintiff known that the representations were false, Plaintiff would not have subscribed, nor caused the funds to be wired.

189. Plaintiff suffered damages of not less than $2,000,000 in relying on the false representation.

190. Plaintiff is entitled to recission and restitution of all amounts paid, or in the alternative to damages of not less than $2,000,000 plus consequential and punitive damages.

**COUNT V**

**CONVERSION**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

191. Plaintiff had and has an immediate right to possession of a specific, identifiable fund of $2,000,000–the deposit transmitted by wire on November 25, 2025, and held under the Deposit Safekeeping Agreement. The funds were specific and identifiable. They were transmitted in a single sum on a date certain, under an agreement designating a named depository institution, a named captive insurance policy, a mandated "non-depletion status," and a daily reporting obligation. They remain traceable.

192. Defendants exercised dominion and control over those funds inconsistent with Plaintiff's rights by removing them from the designated Truist Safekeeping Account or never placing them there; by depleting an account required to be non-depleting; by commingling them with reserves for unrelated captive insurance programs; by applying them to Defendants' own purposes including an

attempted real estate purchase in South Carolina; and by refusing to return them upon demand.

193. Plaintiff demanded return of the funds, including through the March 10, 2026, Notice of Default and Demand for Repayment and repeatedly thereafter. Defendants refused.

194. Defendants' conversion was willful, wanton, and in conscious disregard of Plaintiff's rights.

195. Plaintiff is entitled to the return of the converted funds or their value, not less than $2,000,000, together with punitive damages and a constructive trust over all traceable proceeds.

**COUNT VI**

**UNJUST ENRICHMENT (IN THE ALTERNATE)**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core;*

*Oman; Burton; and Martin*

196. This count is pleaded in the alternative to Counts I and II under Fed. R. Civ. P. 8(d)(2), in the event any Defendant is found not bound by an enforceable contract.

197. Plaintiff conferred a benefit of $2,000,000 on Defendants. Defendants appreciated and knowingly accepted the benefit and retained it under circumstances making the return of funds expected by Defendants and under circumstances making retention inequitable.

198. Plaintiff is entitled to restitution of not less than $2,000,000 and to a constructive trust and equitable lien over the traceable proceeds.

**COUNT VII**

**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

199. The Membership Interests Plaintiff purchased are securities. They are membership interests in a Wyoming limited liability company, offered pursuant to an Executive Summary whose Exhibit B states that they are "being offered and sold in reliance upon the exemption from the registration requirements of the Securities Act of 1933 afforded by Regulation D, Rule 506," sold under a Subscription Agreement made "only to 'accredited investors' (as defined in Rule 501 of Regulation D under the Securities Act)," restricted as to transfer, and held by Members who under the LLC Agreement § 2.5.3 "shall not participate or take part in the management or control of the Company business, and shall have no right or authority to act for or bind the Company." Plaintiff invested money in a common enterprise with an expectation of profits derived solely from the efforts of others.

200. The Promissory Note is likewise a security, and in any event is part of the same securities transaction: Section 23 of the Subscription Agreement provides that "[t]his Subscription Agreement, the Surety Agreement, and Promissory Note are all part of one transaction."

201. Defendants, directly and indirectly, by use of the means and instrumentalities of interstate commerce, in connection with the purchase or sale of securities described above: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and courses of business that operated as a fraud upon Plaintiff.

202. Defendants acted with scienter. The facts giving rise to a strong inference include: Burton's recorded admission that Oman deposited only $1,500,000 while representing that the full $2,000,000 had been deposited; Burton's written admission that he fabricated Bank Secrecy Act disclosure paperwork; the provision of a Fedwire reference number the receiving bank confirmed did not exist; the recitation in a signed instrument of a specific captive insurance policy number and of Lloyd's reinsurance; the structuring of the transaction around a surety that was void from inception for non-payment and that excluded by its own Section 16 the very dishonesty that occurred; the organization of the protected-cell entity fourteen days after funding; Burton's undisclosed and then-operative SEC bar; Oman's undisclosed diversion status; and the existence of at least one other unpaid investor.

203. Plaintiff relied on Defendants' misrepresentations and is entitled to a presumption of reliance as to their material omissions.

204. Plaintiff suffered economic loss proximately caused by the misconduct. The risks Defendants concealed, namely that there was no funded surety, no existing

protected cell, no segregation, and no Truist non-depletion account, are precisely the risks that materialized.

205. Plaintiff is entitled to damages of not less than $2,000,000, plus interest and costs.

## COUNT VIII

## CONTROL PERSON LIABILITY UNDER SECTION 20(a)

*Against Oman; Burton; and Martin*

206. On information and belief, Oman and Martin were controlling persons of UM Capital and UM Capital PCC; Burton was a controlling person of UM Capital PCC, Phoenix Captive, and PCS Core, within the meaning of 15 U.S.C.§ 78t(a), by virtue of their management positions, ownership interests, signature authority, and actual control over those entities' operations, communications with Plaintiff, and disposition of Plaintiff's funds. Oman is the Managing Member named in UM Capital PC's Articles of Organization; Burton signed those Articles as Manager of the organizer.

207. Oman and Burton were culpable participants in the violations alleged in Count VII.

208. They are jointly and severally liable with the entity Defendants to the same extent as those entities.

**COUNT IX**

**BREACH OF FIDUCIARY DUTY**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

209. Defendants owed Plaintiff fiduciary duties of loyalty, care, candor and segregation, arising from (a) the Deposit Safekeeping Agreement, which made UM Capital the custodian of a fund required to be held at a named institution in a non-depletion status and accounted for daily; (b) Burton's role as captive fiduciary responsible for the reserves in which Plaintiff's funds were held; and (c) Defendants' status as promoters of a security offering.

210. Defendants breached those duties by failing to place or keep the funds at Truist; by depleting an account required to be non-depleting; by never issuing a single daily balance report; by commingling Plaintiff's money with reserves belonging to unrelated captive insurance programs; by taking funds from the SafeCare captive to cover a shortfall in Plaintiff's transaction; by attempting to apply leveraged proceeds to a real estate purchase; by concealing the surety's voidness, the non-existence of the protected-cell entity, Burton's SEC bar and Oman's diversion status; by making false statements about the status of the funds over a period of ten months; and by refusing to return the deposit.

211. As a proximate result of the breach of fiduciary duties, Plaintiff has been damaged in an amount not less than $2,000,000 and is entitled to disgorgement of all

profits and benefits derived from the breach, punitive damages, and a constructive trust.

## COUNT X

## VIOLATION OF 18 U.S.C. § 1962(c) (CIVIL RICO)

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

212. For purposes of this Count, Plaintiff does not rely upon any conduct actionable as fraud in the purchase or sale of securities to establish a predicate act of racketeering activity. Those matters are alleged as background and in support of Plaintiff's separate securities and state-law claims, but not as predicate acts supporting this Count.

213. The racketeering conduct alleged in this Count arose after Plaintiff's securities transaction had been completed and, in particular, after UM Capital's repayment obligations became fixed and due. The Promissory Note matured on January 19, 2026, and the Deposit Safekeeping Agreement expired on January 25, 2026. At that point, the $2,000,000 was required to be returned to Plaintiff. No further purchase or sale of securities by Plaintiff was contemplated, requested, or induced by the conduct alleged below.

214. Beginning no later than February 2026, Defendants engaged in a separate and continuing scheme to retain possession and control of Plaintiff's property, prevent and delay Plaintiff from recovering that property, conceal the location and disposition of the funds, forestall litigation, attachment, regulatory

intervention, and other collection remedies, and permit the continued transfer, commingling, use, and dissipation of funds while falsely representing that repayment was imminent or had already been initiated (the "Post-Default Scheme").

215. There existed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), consisting of UM Capital, UM Capital PCC, Phoenix Captive, PCS Core, Oman, Burton, and Martin, together with other participants identified herein (the "UM Enterprise"). During the Post-Default Scheme, the UM Enterprise had the common purpose of maintaining control over funds due Plaintiff, concealing their disposition, preventing or delaying recovery, and preserving Defendants' ability to continue using, transferring, and commingling those funds. The Enterprise had continuing relationships among its participants and sufficient longevity to pursue those purposes.

216. Each Defendant named in this Count is a "person" within the meaning of 18 U.S.C. § 1961(3) and is distinct from the UM Enterprise. Each participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described below.

217. Oman made repeated false representations concerning the location and imminent return of Plaintiff's funds. Burton acted as the captive fiduciary, communicated directly with Plaintiff regarding repayment, transmitted purported evidence of wires and available funds, supplied false or nonexistent wire information, moved or participated in moving funds among captive programs, and fabricated financial or regulatory documentation. Martin and the entity Defendants provided

and operated the entities, accounts, contractual relationships, and financial structure through which the funds were retained, pooled, transferred, and concealed.

218. In furtherance of the Post-Default Scheme, Defendants knowingly transmitted or caused to be transmitted interstate wire communications containing materially false representations concerning the status, location, movement, and imminent repayment of Plaintiff's funds, with the intent that Plaintiff rely upon those representations by delaying litigation, attachment, collection efforts, regulatory referral, and other measures that could have resulted in recovery or restraint of the funds.

219. The predicate acts of interstate wire fraud under 18 U.S.C. § 1343 include, without limitation:

a. the February 24, 2026 interstate telephone communication in which Oman gave a materially false account of the status and protection of Plaintiff's funds and represented that the funds were not at risk;

b. the March 5, 2026 interstate telephone communication in which Oman represented that Plaintiff's $2,000,000 was “en route back” and that he expected it to “go out today,” when no such repayment was sent;

c. the March 6, 2026 interstate telephone communication attributing the failure to return Plaintiff's money to a USB-token and retina-scan requirement associated with a purported treasury-management platform;

d. the April 22, 2026 interstate communication in which Oman represented that Plaintiff's money "never has left Truist" while explaining the continued failure to return it;

e. the June 29, 2026 interstate electronic transmission by Burton of a purported wire notification bearing Confirmation No. OW00007098744200 and representing that $2,000,000 had been returned at the recipient's request, when Plaintiff had made no such request and no funds were received;

f. the interstate communications between July 24 and July 30, 2026 in which Burton repeatedly represented that Plaintiff's funds were coming from escrow, were "almost done," or would be transmitted the following day;

g. the July 28, 2026 interstate transmission of a screenshot depicting an unrelated cryptocurrency balance of $3,207,166.12 as purported evidence supporting Defendants' promises of repayment;

h. the July 31 and August 1, 2026 interstate communications in which Burton represented that wires had been transmitted and that Plaintiff's repayment had been debited before the applicable cutoff, when no funds were received;

i. the August 3, 2026 interstate transmission of purported Fedwire reference number 202607311B7033R016331, which Plaintiff's receiving bank confirmed corresponded to no pending or completed transaction;

j. the August 24 and August 25, 2026 interstate communications in which Burton represented that a $1,500,000 repayment would arrive "for sure" that day, when no payment was transmitted;

k. the September 1, 2026 interstate transmission of the purported "DEBIT CONFIRMATION" showing a $1,500,422 debit from Phoenix Captive Solutions LLC, bearing internally inconsistent transaction dates and relating to a payment that Plaintiff never received;

l. the September 4, 2026 interstate communication in which Burton represented that cash had moved from an Emergent Energy PCC Ltd. account and was "landing," when no funds were received; and

m. the September 10, 2026 interstate communication in which Burton represented that Plaintiff's wire had been taken from an EE Resources PCC Ltd. captive account approximately two weeks earlier but that final credits were being held, when no funds were received.

220. Each communication identified above occurred after Plaintiff's purchase of the securities had been completed and after Defendants' obligation to return Plaintiff's funds had arisen. Plaintiff relies upon these communications as predicate acts because they furthered the independent Post-Default Scheme to retain, conceal, transfer, and prevent recovery of Plaintiff's property, and not because they induced or otherwise concerned Plaintiff's purchase or sale of a security.

221. The interstate communications were material and were intended to lull Plaintiff into believing that repayment had been initiated or was imminent, thereby

delaying Plaintiff's resort to litigation, attachment, regulatory authorities, and other collection remedies while Defendants maintained control of, commingled, transferred, or dissipated property that otherwise could have been pursued for recovery.

222. The predicate acts were related because they had the same or similar purposes, participants, victim, methods, and results: each sought to prevent Plaintiff from taking action to recover its property by falsely representing that repayment was imminent or underway while Defendants continued to control and dispose of the funds.

223. The predicate acts also constitute or threaten continued racketeering activity. They continued for more than seven months after repayment became due, involved repeated and escalating fabricated explanations and purported banking records, were carried out through entities continuing to hold and administer third-party funds, and, as alleged above, occurred against a backdrop in which multiple other persons or entities were awaiting repayment of principal or interest.

224. Plaintiff directly relied upon the post-default representations by postponing litigation, attachment, regulatory referral, and other collection activity. During that period, Defendants continued to commingle, transfer, encumber, or dissipate funds and assets available for repayment. Plaintiff thereby suffered injury to its business and property directly caused by the Post-Default Scheme, including the impairment and loss of recovery against funds and assets that could have been

pursued before their further disposition, together with consequential losses resulting from the delayed recovery of its property, in an amount to be proven at trial.

225. Plaintiff seeks threefold the damages proximately caused by the violation of § 1962(c), together with costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**COUNT XI**

**VIOLATION OF 18 U.S.C. § 1962(d) (RICO CONSPIRACY)**

*Against UM Capital; UM Capital PCC; Phoenix Captive; PCS Core; Oman; Burton; and Martin*

226. Following the maturity of the Promissory Note and expiration of the Deposit Safekeeping Agreement, Defendants knowingly agreed, expressly or tacitly, that members of the UM Enterprise would conduct or participate in the conduct of the Enterprise's affairs through the pattern of racketeering activity described in Count X for the purpose of retaining control of Plaintiff's property, concealing its location and disposition, delaying Plaintiff's recovery efforts, and permitting the continued use, transfer, commingling, or dissipation of funds while representing that repayment was underway or imminent.

227. The agreement is evidenced by Defendants' coordinated and mutually reinforcing communications and conduct concerning purported repayment; Burton's transmission of purported wire confirmations and banking information; Oman's repeated representations regarding the location and imminent transmission of the same funds; Burton's participation in moving funds among unrelated captive

programs; the use of Phoenix Captive, PCS Core, UM Capital, and UM Capital PCC in connection with the custody, movement, and concealment of those funds; and Defendants' continued repetition of materially inconsistent explanations for why repayment had supposedly been initiated but never received.

228. Defendants knew the essential nature and scope of the Post-Default Scheme and agreed that one or more members of the Enterprise would commit predicate acts of interstate wire fraud to further it. Plaintiff does not rely upon conduct actionable as fraud in the purchase or sale of securities to establish this agreement or the predicate racketeering activity supporting this Count.

229. In furtherance of the conspiracy, members of the Enterprise committed the acts of interstate wire fraud identified in Count X, which were independently wrongful acts constituting racketeering activity under 18 U.S.C. §§ 1343 and 1961(1).

230. Plaintiff was directly injured in its business and property by reason of those acts because the false repayment communications caused Plaintiff to delay litigation, attachment, regulatory referral, and other collection measures while funds and assets available for repayment were further transferred, commingled, encumbered, or dissipated.

231. Plaintiff is entitled to recover threefold the damages proximately caused by the violation of § 1962(d), together with costs of suit and reasonable attorneys' fees under 18 U.S.C. § 1964(c)

**COUNT XII**

**VIOLATION OF SECTION 10(b) OF THE**

**EXCHANGE ACT AND RULE 10b-5**

*Against NY CRE, PFO Trust, Pivot Capital, Hearne, Aaron, Wassell, and Martin*

232. NY CRE is the issuer of the securities Plaintiff purchased. Pivot is its manager. Hearne is Pivot's Managing Director and signed the acceptance of Plaintiff's subscription. Aaron signed that acceptance as Trustee of PFO Trust, NY CRE's 98% member. Each of these Defendants was a maker of, or had ultimate authority over, the statements in the offering documents, or engaged in conduct constituting a scheme to defraud.

233. In connection with the offer and sale of the Membership Interests, these Defendants made the following untrue statements of material fact, including;

a. Schedule A to the LLC Agreement represents that PFO Trust made a Capital Contribution of $98,000,000 and that total contributions to the entity were $100,000,000. Upon information and belief, no such contribution was made and the entity's capital consisted solely of Plaintiff's $2,000,000.

b. Exhibit B to the Executive Summary states that "[t]he Entity's investment will be guaranteed by a bank which will guarantee a minimum return." No bank guaranteed the investment or any return.

c. The Executive Summary represents that the entity would invest in "opportunities provided by certain U.S. banks," selected through "due

diligence" and "approved by Pivot Capital Partners LLC." The entity's capital was instead wired in its entirety to a private borrower under a two-month note, purportedly secured by a surety issued by a single-officer Ontario corporation operating from a residential address.

d. At 7:15 a.m. on November 25, 2025, hours before the wire, Hearne wrote to Plaintiff: "The executed surety and the safekeeping doc are to you now." No executed surety had been delivered; the document Plaintiff received was unsigned by the Surety. The Agreement was in any event void from inception under its own Section 4 for non-payment of the Agreement Fee and was cancelled the day after Plaintiff's funds moved.

e. The Executive Summary represents that the Manager "will evaluate potential investment opportunities offered by third parties" and "will be responsible for the management of the Entity." No adequate evaluation was performed.

234. These Defendants failed to disclose, and had a duty to disclose, each of the following items.

a. that the $115,000 Agreement Fee had not been paid to the Surety, that the Surety was therefore void under its own terms, and that the Surety would be and was cancelled for non-payment;

b. that the Agreement Fee was directed to an individual's personal bank account at a Canadian credit union, at the same residential address given for the Surety itself;

c. that the Surety Agreement's Exhibit E identified a Promissory Note dated November 7, 2025, and its Section 1 identified a Note dated November 21, 2025, neither of which matches the executed Note dated November 19, 2025, and that under Section 5 the Surety Agreement would be void if the Loan Agreement were amended without the Surety's written approval;

d. that UM Capital PCC LLC, the protected-cell entity in the represented captive structure, did not yet exist;

e. that Burton, the captive fiduciary who would control the disposition of the funds, was subject to a standing order of the Securities and Exchange Commission barring him from association with any broker, dealer or investment adviser;

f. that Oman had a criminal history resolved through judicial diversion and, upon information and belief, remained on active diversion status;

g. that the "Funding Partner" identified in Pivot's Conflict of Interest Disclosure was UM Capital, the borrower of Plaintiff's money, and that the individual who would "exercise management control over the Investor's investment vehicle" was also advising that borrower;

h. that on November 20, 2025, Pivot executed an advisory agreement placing Plaintiff and UM Capital, the borrower, into a single joint advisory relationship under a provision permitting Pivot to "rely upon instructions from either party with respect to disposition of the Assets";

i. that Aaron, the Trustee executing the instruments on the depositor's and obligee's side, was affiliated with PFO Trust, the entity whose $98,000,000 contribution is unsubstantiated, and was appointed at the instance of the counterparty; and

j. that no documentation curing the Section 16 dishonesty exclusion had been or would be prepared, notwithstanding that Hearne had made such documentation a condition of the wire; and

k. that other investors had placed funds with UM Capital on similar representations and had not been repaid.

235. Each of these Defendants acted with scienter or, at minimum, with recklessness amounting to an extreme departure from the standards of ordinary care. Pivot is an SEC-registered investment adviser; Hearne is its Managing Director; both held themselves out as having evaluated the Investment Opportunity. A registered adviser that signs a capitalization table reciting a $98,000,000 contribution that he has not verified and vouches for a surety whose fee it has not confirmed was paid, acts at least recklessly.

236. Plaintiff relied on these statements and omissions. Section 7(b)(i) of the Subscription Agreement records that Plaintiff "has not been furnished any offering literature other than the Executive Summary, and the undersigned has relied only on the information contained therein." Plaintiff is further entitled to a presumption of reliance as to material omissions.

237. Plaintiff suffered economic loss proximately caused by the misconduct and is entitled to damages of not less than $2,000,000, plus interest and costs.

**COUNT XIII**

**CONTROL PERSON LIABILITY UNDER SECTION 20(a)**

*Against NY CRE, PFO Trust, Pivot Capital, Hearne, Aaron, Wassell, and Martin*

238. Pivot was a controlling person of NY CRE. Section 1.1.27 of the LLC Agreement designates Pivot as "Manager"; the Executive Summary states that the Manager "will be responsible for the management of the Entity and able to exercise its rights and duties under the Entity's LLC Agreement"; and § 2.5.3 provides that "[t]he Members who are not the Manager shall not participate or take part in the management or control of the Company business, and shall have no right or authority to act for or bind the Company."

239. Hearne was a controlling person of both Pivot and NY CRE as Pivot's Managing Director and the individual who executed the governing instruments on the Manager's behalf.

240. PFO Trust, holder of a stated 98% Percentage Interest and the Member through which NY CRE accepted Plaintiff's subscription, and Aaron, its Trustee and the signatory on every instrument executed on NY CRE's behalf, were each controlling persons of NY CRE.

241. Each was a culpable participant in the violations alleged in Count XII and is jointly and severally liable under 15 U.S.C. § 78t(a).

**COUNT XIV**

**VIOLATION OF THE WYOMING UNIFORM SECURITIES ACT,**

**WYO. STAT. ANN. §§ 17-4-501, 17-4-509**

*Against All Defendants*

242. The Membership Interests are securities within the meaning of Wyo. Stat. Ann. § 17-4-102.

243. The offer and sale were made in and from Wyoming, by a Wyoming limited liability company, under instruments governed by Wyoming law designating Wyoming courts.

244. As described above, Defendants, in connection with the offer and sale, employed devices, schemes and artifices to defraud, made untrue statements of material fact and omitted material facts necessary to make the statements made not misleading; and engaged in acts, practices and courses of business operating as a fraud or deceit upon Plaintiff, in violation of Wyo. Stat. Ann. § 17-4-501.

245. NY CRE, PFO Trust, Pivot, Hearne, Aaron and the UM Defendants are liable to Plaintiff as sellers and as persons who directly or indirectly controlled a person liable, under Wyo. Stat. Ann. § 17-4-509.

246. Pivot and Hearne are separately liable under Wyo. Stat. Ann. § 17-4-509 as an investment adviser and investment adviser representative that materially aided the conduct giving rise to liability, and as persons that received consideration for providing investment advice while employing a device, scheme or artifice to defraud or engaging in an act, practice or course of business operating as a fraud or

deceit. No Defendant can sustain the burden of proving that it did not know and, in the exercise of reasonable care, could not have known of the conduct by reason of which liability exists.

247. Plaintiff tenders the securities purchased and elects rescission, seeking the consideration paid together with interest, costs and reasonable attorneys' fees as provided by Wyo. Stat. Ann. § 17-4-509, or in the alternative damages in the amount provided by that section.

**COUNT XV**

**VIOLATION OF THE INVESTMENT ADVISERS ACT OF 1940**

**RESCISSION UNDER SECTION 215(b)**

*Against Pivot Capital Partners LLC*

248. Pivot is an investment adviser within the meaning of 15 U.S.C. § 80b-2(a)(11) and is registered with the Commission under CRD No. 335324.

249. The Non-Discretionary Portfolio Management Agreement dated September 18, 2025, between Pivot and Plaintiff, and the further agreement executed November 20, 2025, naming Plaintiff as Client, are investment advisory contracts within the meaning of 15 U.S.C. § 80b-15(b).

250. The performance of those contracts involved violations of the Investment Advisers Act, including Section 206, in that Pivot, while acting as Plaintiff's adviser and receiving compensation for advice, simultaneously served as Manager of the issuer selling securities to Plaintiff, executed the acceptance of Plaintiff's subscription on the issuer's behalf, and executed an advisory instrument

placing Plaintiff and the borrower into a single joint advisory relationship under a provision permitting the Adviser to "rely upon instructions from either party with respect to disposition of the Assets" and disclosed those conflicts only through an undated, unsigned Conflict of Interest Disclosure that identified no counterparty and quantified no fee, and therefore without the full and fair disclosure the Act requires.

251. Under Section 215(b), 15 U.S.C. § 80b-15(b), a contract whose performance involves a violation of the Advisers Act is void as regards the rights of the violator. Plaintiff is entitled to rescission of the advisory contracts and to restitution of all consideration paid to Pivot thereunder.

**COUNT XVI**

**BREACH OF FIDUCIARY DUTY**

*Against NY CRE, PFO Trust, Pivot Capital, Hearne, Aaron, Wassell, and Martin*

252. As Plaintiff's investment adviser under a written advisory contract, and as a fiduciary under the Investment Advisers Act, Pivot owed Plaintiff an affirmative duty of utmost good faith, full and fair disclosure of all material facts, and an obligation to employ reasonable care to avoid misleading its client. Hearne, who executed that contract and directed Pivot's conduct, owed the same duties.

253. Pivot and Hearne breached those duties by taking on the role of Manager of the issuer selling securities to their own advisory client; by executing the acceptance of Plaintiff's subscription on the issuer's side; by executing an advisory instrument placing the borrower alongside Plaintiff as a joint client under a provision permitting Pivot to take disposition instructions from either; by permitting Plaintiff's

capital to be committed to a transaction bearing the characteristics described in this Complaint without adequate diligence; by representing on the morning of the wire that "[t]he executed surety and the safekeeping doc are to you now" when no executed surety had been delivered and without confirming that the Agreement Fee had been paid; by conditioning the wire on documentation curing the Section 16 dishonesty exclusion and then permitting the wire to proceed without it; by failing to detect or disclose that Burton was subject to an SEC bar; by failing to verify the $98,000,000 capital contribution recited on Schedule A; and by making a Conflict of Interest Disclosure that was undated, unsigned, identified no counterparty, quantified no fee, and omitted each of the matters set forth in paragraph 234 above.

254. NY CRE owed Plaintiff, its member and the beneficiary for whom it held the transaction, duties of loyalty, care and disclosure. Aaron, who executed every instrument on NY CRE's behalf as "Trustee," owed the duties of one who assumes that office. PFO Trust, as the Member through which NY CRE accepted Plaintiff's subscription and the holder of a stated 98% interest, exercised control over NY CRE and owed corresponding duties.

255. They breached those duties by executing, on behalf of the entity holding Plaintiff's money, a Note, a Safekeeping Agreement and a Surety Agreement whose terms and counterparties they had not verified; by permitting NY CRE to be operated in the interests of the counterparty; by subscribing NY CRE to a capitalization table they knew or should have known was unsupported; by taking no step to protect or recover Plaintiff's funds after the surety was cancelled on November 26, 2025; and,

as to Aaron, by failing to respond to the April 17, 2026 Formal Notice of Material Discrepancy.

256. Plaintiff has been damaged in an amount not less than $2,000,000 and is entitled to disgorgement of all fees and benefits received, punitive damages, and a constructive trust.

**COUNT XVII**

**FRAUDULENT AND NEGLIGENT MISREPRESENTATION**

*Against Hearne and Pivot Capital*

257. On November 24, 2025, at 3:07 p.m., Hearne wrote to Babe Kilgore, copying UM Capital, Jameson Pugh and David Gunther, that "with documentation covering Clause 16 (regarding fraud and acts of dishonesty exclusions) and the executed Surety, good to wire after," and asked Oman and Gunther to have the Clause 16 documentation "drafted."

258. At 7:15 a.m. on November 25, 2025, hours before Plaintiff's $2,000,000 was released, Hearne wrote to Babe Kilgore: "Good morning! The executed surety and the safekeeping doc are to you now. I have also arranged for the $500k to be wired to the SPE as well. Please advise when comfortable and can move forward ASAP."

259. The representation was false in two respects. No executed surety had been delivered: at 7:28 a.m., thirteen minutes later, Babe Kilgore replied, "I think you may have sent me the wrong version of the Surety. The one you sent me was not signed by the Surety (Peter)." And the Agreement was in any event incapable of being "executed" in any operative sense, because the Agreement Fee had not been paid to

the Surety; under Section 4 the Agreement was "null and void and of no force or effect"; by the Term provision it was never effective, effectiveness being conditioned on payment; and it was cancelled on November 26, 2025, for non-payment.

260. Nor was the other condition Hearne had set satisfied. Upon information and belief, no documentation curing the Section 16 dishonesty exclusion was ever drafted or delivered.

261. Nor was the other condition Hearne had set satisfied. Upon information and belief, no documentation curing the Section 16 dishonesty exclusion was ever drafted or delivered.

262. Hearne and Pivot made the representation knowing it was false, recklessly without knowledge of its truth, or, in the alternative, negligently and without exercising reasonable care to ascertain its truth, in the course of a transaction in which they had a pecuniary interest and for the guidance of Plaintiff, whom they knew would rely on it.

263. A reasonable investment adviser in Pivot's position, holding the Surety Agreement and knowing that its effectiveness was expressly conditioned on payment of a $115,000 fee, would have confirmed payment before telling its advisory client that the executed surety had been delivered. Upon information and belief, Hearne did not confirm payment with the Surety and relied solely on Oman's word. Hearne had himself made delivery of the executed Surety a condition of the wire the previous afternoon and was therefore on notice of its importance.

264. The representation was material. The surety was the protection that made the transaction acceptable to Plaintiff. Plaintiff would not have allowed the $2,000,000 to be released without it.

265. Plaintiff justifiably relied on the representation and has been damaged in an amount not less than $2,000,000, plus consequential damages, and is entitled to punitive damages on the fraudulent-misrepresentation theory.

**COUNT XVIII**

**AIDING AND ABETTING FRAUD AND BREACH OF FIDUCIARY DUTY**

*Against NY CRE, PFO Trust; Pivot Capital, Hearne, Aaron, Wassell, and Martin*

266. The UM Defendants committed fraud against Plaintiff and breached fiduciary duties owed to Plaintiff, as alleged in Counts III, IV and IX.

267. Each Defendant named in this Count had actual knowledge of that underlying wrongdoing or was willfully blind to it. Aaron signed every instrument on the depositor's side while affiliated with the Member whose capital contribution was unsupported. Hearne vouched for a surety he had not confirmed was funded. Pivot, as Manager, held the transaction documents. Martin, as UM Capital's officer, executed the Safekeeping Agreement reciting Lloyd's reinsurance, a Truist Safekeeping Account and a captive policy number.

268. Each provided substantial assistance: Aaron by executing the instruments without which the funds could not have moved; Hearne and Pivot by furnishing the surety assurance and the imprimatur of an SEC-registered adviser; NY CRE and PFO Trust by serving as the conduit and by lending the appearance of

a $100,000,000 capitalization; and Martin by executing the Note and the Safekeeping Agreement.

269. That assistance was a substantial factor in causing Plaintiff's loss. Plaintiff is entitled to damages of not less than $2,000,000, plus consequential and punitive damages, jointly and severally with the primary wrongdoers.

**COUNT XIX**

**CIVIL CONSPIRACY**

*Against All Defendants*

270. Defendants agreed among themselves to accomplish an unlawful purpose of obtaining and retaining Plaintiff's $2,000,000 through misrepresentation and concealment, and to accomplish a lawful purpose through unlawful means.

271. The agreement is evidenced by, among other things, the coordinated same-day execution of the Executive Summary, Subscription Agreement and LLC Agreement bearing an unsupported $100,000,000 capitalization; the execution on November 20, 2025 of an advisory instrument naming the borrower's officer as "Joint Owner" alongside Plaintiff; Aaron's execution of every instrument on the depositor's side; the coordinated representations preceding the wire; and Oman's and Burton's parallel and mutually reinforcing false assurances over the ten months that followed.

272. Defendants committed overt acts in furtherance of the conspiracy, including each act described in this Complaint.

## COUNT XX

## DECLARATORY JUDGMENT, CONSTRUCTIVE TRUST, AND ACCOUNTING

*Against all Defendants*

273. An actual, justiciable controversy exists concerning the corporate separateness of the UM Defendants and the liability of PCS Core for the obligations of Phoenix Captive

274. Plaintiff seeks a declaration under 28 U.S.C. §§ 2201 and 2202 that: (a) UM Capital, LLC, UM Capital PCC LLC, Phoenix Captive Solutions LLC and PCS Core are alter egos of one another and of Oman and Burton, each liable for the obligations of the others; (b) PCS Core is liable for all obligations of Phoenix Captive as its successor, as a mere continuation, and as the surviving entity of a de facto merger; and (c) Defendants hold Plaintiff's $2,000,000 and all traceable proceeds in constructive trust for Plaintiff.

275. Plaintiff further seeks an accounting of all funds received from or on behalf of Plaintiff and of every disposition of those funds, including the daily balance reports that Section 4 of the Deposit Safekeeping Agreement required and that were never issued.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kilgore Energy, LLC d/b/a NeRD Power respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

A. On Counts I and II, awarding compensatory damages of not less than $2,000,000, together with prejudgment interest at the Wyoming statutory rate, costs, and reasonable attorneys' fees under Paragraph 4 of the Promissory Note as enforced for Plaintiff's benefit under Paragraph 9;

B. On Counts III, IV, IX, XVI, XVII, XVIII and XIX, awarding compensatory damages of not less than $2,000,000, plus consequential damages in an amount to be proven at trial, and punitive damages;

C. On Count IV, in the alternative, rescinding the Subscription Agreement, the Promissory Note, the Independent Surety Agreement and the Deposit Safekeeping Agreement and awarding full restitution;

D. On Count V, ordering the return of the converted funds or awarding their value of not less than $2,000,000, together with punitive damages and a constructive trust over all traceable proceeds;

E. On Count VI, awarding restitution of not less than $2,000,000;

F. On Counts VII, VIII, XII and XIII, awarding damages under the Securities Exchange Act of 1934 of not less than $2,000,000, plus prejudgment interest and costs;

G. On Counts X and XI, awarding threefold Plaintiff's damages, together with the costs of suit and reasonable attorneys' fees under 18 U.S.C. § 1964(c);

H. On Count XIV, awarding rescission and recovery of the consideration paid, together with interest, costs and reasonable attorneys' fees under Wyo. Stat. Ann. § 17-4-509;

I. On Count XV, declaring the advisory contracts void as regards Pivot Capital Partners LLC and awarding restitution of all consideration paid thereunder under 15 U.S.C. § 80b-15(b);

J. On Count XX, declaring the UM Defendants alter egos of one another and of Defendants Oman and Burton, declaring PCS Core liable as successor to Phoenix Captive Solutions LLC, imposing a constructive trust over Plaintiff's funds and all traceable proceeds, and ordering a full accounting;

K. Awarding prejudgment and post-judgment interest at the maximum rates permitted by law;

L. Awarding Plaintiff its costs and reasonable attorneys' fees; and

M. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: **September 30, 2026**

Respectfully submitted,

API Law, PLLC,

/s/ Philip L. Martin

Philip L. Martin (8-7230)
API Law, PLLC
260 South 1200 West
Orem, UT 84058
philip@api.law
888-521-0322
*Attorney for Plaintiff Kilgore Energy, LLC dba NeRD Power Attorneys*